IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALLIENT C. MOORE,              )<br>                                                 )<br>        Petitioner,              )<br>                                                 )<br>   v.                                          )<br>                                                 )<br>A.K. SCRIBNER,                      )<br>                                                 )<br>        Respondent.               )<br>_____ ) | No. C 04-4064 MMC (PR)<br><br>**ORDER DENYING PETITION FOR<br>A WRIT OF HABEAS CORPUS** |

On September 27, 2004, petitioner Vallient C. Moore, a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 14, 2004, the Court ordered respondent to show cause why the petition should not be granted based on petitioner's three cognizable claims for relief. Respondent filed an answer accompanied by a memorandum and exhibits, and petitioner filed a traverse.

**BACKGROUND**

On June 10, 2002, petitioner was charged in Alameda County Superior Court with one count of second degree robbery and one count of assault by force likely to produce great bodily injury, as well as a sentence enhancement on each count for personally inflicting great bodily injury. A jury found him guilty on both counts, but did not find the enhancements to be true. The trial court thereafter found allegations that petitioner had two prior "strike" convictions to be true. The trial court sentenced petitioner to a term of 35 years to life in state prison on the robbery conviction, and stayed a concurrent sentence of 25 years to life on the assault conviction. The California Court of Appeal affirmed, and the Supreme Court of

California summarily denied the petition for review.

The California Court of Appeal summarized the facts adduced at trial as follows:

> James Murphy ["Murphy"] was known as "Watchman." Among other odd jobs, he bought watches at a flea market and sold them in and around his neighborhood in Oakland. On May 2, 2002, a man (the first suspect) approached Murphy to buy some watches, and asked Murphy to drive him to an address a few blocks away to complete the sale. Murphy, together with his girlfriend Charlesetta Blow ["Blow"], drove him to this address. Once there, Murphy stood in front [of] the house as the first suspect called out to its occupants. Blow remained in Murphy's vehicle. A second man (the second suspect) emerged from the house and struck Murphy in the face with his fist. Blow did not see this first blow, but seconds later looked over and saw both suspects hitting and kicking Murphy on the sidewalk. They took Murphy's watches and watch case, his mobile telephone, a ring, and some cash, and then ran from the scene. Blow drove Murphy to a nearby hospital, where he was treated for a broken nose and other injuries. While at the hospital, Blow and Murphy each gave physical descriptions of the suspects to a police officer.

People v. Moore, No. A102720, slip op. at 1-2 (Cal. Ct. App. April 29, 2004) (hereinafter "Slip Op.") (attached as Resp.'s Ex. 3).

In the instant petition, petitioner raises the following claims of constitutional error: (1) the use of identification evidence resulting from an unduly suggestive identification procedure violated his right to due process; (2) his statement to the police regarding his residence was taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and the admission of this statement violated his right against self-incrimination; and (3) the denial of his counsel's request to omit a flight instruction interfered with counsel's strategy and violated petitioner's constitutional right to the effective assistance of counsel.

**DISCUSSION**

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of

2

the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). In the instant case, because the California Supreme Court summarily denied the petition for review, the highest state court decision to address the merits of petitioner's claims was the California Court of Appeal's affirmance of petitioner's conviction and sentence on direct appeal.

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 413; Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "Clearly established federal law, as determined by the Supreme

Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. A state court decision no longer may be overturned on habeas review simply because of a conflict with circuit-based law, although circuit decisions remain relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir. 2003). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

If the state court decision was either contrary to or an unreasonable application of clearly established federal law, within the meaning of AEDPA, habeas relief is still only warranted if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 796 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

Finally, a federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

B. Petitioner's Claims

    1. Admission of Eyewitness Identification Evidence

Petitioner claims the admission of evidence of Murphy's identification of petitioner violated his right to due process. Evidence was admitted that Murphy identified petitioner in a photographic lineup the day after the incident, and thereafter identified him in court, as the man who initially approached Murphy and rode in the car with Murphy and Blow to the house where the assault and robbery took place.[1] The California Court of Appeal set out the pertinent background for this claim as follows:

---

[1] Evidence was admitted at trial that Blow likewise identified petitioner in the photographic lineup and again at trial; petitioner does not challenge the admission of such evidence.

4

> The day after the assault and robbery, an investigating officer prepared a six-photographic lineup that included a photograph of Moore. The officer showed it to Blow and Murphy, and each identified Moore as one of the two perpetrators. Moore moved in limine to exclude any identifications by Blow or Murphy, either these out-of-court lineup identifications or any subsequent in-court identifications, on the ground that the lineup had been unduly suggestive in violation of his constitutional due process rights. At an evidentiary hearing on the issue, the prosecution submitted the photographic lineup into evidence, and both parties examined the investigating officer concerning the circumstances surrounding his preparation of the lineup and the manner in which he presented it. The trial court denied Moore's motion to exclude identifications by Blow and Murphy.
>
> . . .
> In Moore's view, the lineup was unduly suggestive because his photograph was made to "stand out" from the others. Specifically, he was the only one of the six men depicted who was wearing earrings. In addition, the investigating officer first showed the lineup to Blow, and asked her to sign and date, on the reverse side, the photograph she had identified. The officer then showed the same lineup to Murphy. This, Moore urges, improperly gave Murphy notice of which individual Blow had identified.
>
> In examining the photographic lineup, the trial court noted that the photograph of Moore depicted him wearing "a small pair of earrings . . . in his right ear . . . . [which] the others do not appear to have." The court also noted, "[I]f I really look for it, knowing it's there, if I look around enough, I can see some indication of a discoloration in [Moore's] hair" caused by Blow's writing on the reverse side of his photograph. The court could not tell whether or to what extent the effect of the writing may have "changed over a period of time." The court did not find these factors dispositive, however. It stated the lineup "essentially shows African-American males certainly of a similar age range. The hair ranges from pretty short to perhaps an inch or two long . . . [and] in terms of the variety of faces . . . these individuals all have very similar characteristics." The court concluded, "I don't think this lineup is suggestive at all," and on this basis denied the motion. Because it determined the lineup was not unduly suggestive, the court never reached the issue whether the lineup was reliable under the totality of the circumstances.

(Slip Op. at 2-4.)

Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures. See Neil v. Biggers, 409 U.S. 188, 196 (1972). Unnecessarily suggestive pretrial identification procedures alone do not require exclusion of in-court identification testimony, however; reliability is the linchpin in determining the admissibility of identification testimony. See Manson v. Brathwaite, 432 U.S. 98, 100-14 (1977). Identification testimony is inadmissible as a violation of due process, therefore, only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. See Van Pilon v.

5

1 Reed, 799 F.2d 1332, 1338 (9th Cir. 1986). The reliability of identification testimony
2 depends on five factors: (1) the witness's opportunity to view the defendant at the time of the
3 incident; (2) the witness's degree of attention; (3) the accuracy of the witness's prior
4 description; (4) the level of certainty demonstrated by the witness at the time of the
5 identification procedure; and (5) the length of time between the incident and the
6 identification. See Manson, 432 U.S. at 114; Neil, 409 U.S. at 199-200.

7 The California Court of Appeal's denial of petitioner's claim was not "contrary to"
8 clearly established federal law under § 2254(d)(1). The Court of Appeal held that petitioner
9 must show the identification procedure was unduly suggestive, and also that it was
10 "unreliable" based on the same five factors set forth in Manson and Neil. (See Slip Op. at 3
11 (citing People v. Ochoa, 19 Cal.4th 353, 412 (1998)).[2] As discussed above, this is the correct
12 governing federal standard for determining whether the admission of identification evidence
13 resulted in a violation of a defendant's right to due process. Moreover, petitioner does not
14 cite any United States Supreme Court decision, and this Court is aware of none, that reached
15 a different result on the basis of a set of facts "materially indistinguishable" from the facts of
16 this case. See Williams, 529 U.S. at 413. Accordingly, the denial of petitioner's claim was
17 not "contrary to" clearly established federal law under § 2254(d)(1). See Early, 537 U.S. at
18 8.

19 Further, the Court of Appeal did not "unreasonably" apply federal law in denying
20 petitioner's claim. Petitioner argues here, as he did before the trial court and the Court of
21 Appeal, that the photographic lineup was impermissibly suggestive because petitioner was
22 the only person depicted wearing an earring in both ears, and because Blow had signed and
23 dated the reverse side of his photograph when she viewed the lineup before Murphy. The
24 Court of Appeal found these factors did not render the photographic lineup impermissibly

---

[2]The Court of Appeal's citation to a decision of the California Supreme Court, rather than to a decision of the United States Supreme Court, is of no consequence as the standard set forth in the California Supreme Court decision is the same as the federal standard. See Early, 537 U.S. at 8 ("Avoiding [AEDPA's] pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original).

6

suggestive, as follows:

> In our view, Moore does not "stand out from the rest" in this photographic lineup. It depicts on a single page six computer-generated photographs of African-American males. All photographs are in color. All the individuals appear to be wearing civilian clothing. All appear to be similar in age. All have the same hair and eye color. All have light-to-heavy mustaches, and only two are clearly without facial hair on the chin. All have similar hair styles, four of which are short and trimmed and very similar in appearance. Moore is the only individual shown with small hoop earrings in both ears, but three others are depicted with one earring in the left ear. There is a range of complexion and facial features, but these differences do not make Moore's "photograph stand out from the rest." Blow's handwriting behind Moore's photograph is not visible, and does not appear to display any discoloration, unless it is held up to backlighting. At the evidentiary hearing, the investigating officer testified that he ensured Murphy viewed the lineup only while it was placed on a folder that prevented backlighting. We conclude the trial court correctly determined the photographic lineup was not unduly suggestive.

(Slip Op. at 5.) Given the similarity among the individuals depicted in the photographs with respect to their race, gender, clothing, facial hair, and hair styles, the fact that Moore had two earrings whereas others had one or none is a relatively minor discrepancy that did not impermissibly suggest Moore was the suspect. See, e.g., United States v. Burdeau, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding placement of photograph and differences in skin tone and facial expression insubstantial and not sufficient to create impermissible suggestion that defendant was offender). Further, there is no showing that Murphy was aware of Blow's signature on the back of the photograph at the time he selected it. Any "discoloration" was only visible under backlighting, and the evidence was uncontradicted that the photograph was not backlit when it was shown to Murphy. Moreover, as further noted by the Court of Appeal, (see Slip Op. at 5), petitioner does not claim, and there is no evidence indicating, the investigating officer said or did anything suggesting a particular suspect to either Murphy or Blow at the time he displayed the photographic lineup, or, for that matter, at any other time.

The Court of Appeal also reasonably found Murphy's identification of petitioner to be reliable. Petitioner argues Murphy's identification was unreliable because Murphy initially provided to the police, while at the hospital on the day of the incident, a description of the

7

1 suspect that did not match petitioner.[3]  Petitioner also cites the fact that Murphy knew

2 petitioner previously but did not immediately identify him to the police as the suspect.[4]  In

3 finding the identification to be reliable, the California Court of Appeal reasoned as follows:

> Moore attempted to show the lineup was not only suggestive but otherwise unreliable because there were inaccuracies in the descriptions Murphy and Blow provided the preceding day.  He attempted to elicit this evidence on his cross-examination of the investigating officer.  This was not, however, the only evidence relevant to the reliability of their identifications.  The investigating officer testified that he knew from the police report that the first suspect "rode in a car with Mr. Murphy to the location where he was assaulted and robbed."  Murphy and Blow thus had a good opportunity to view this suspect.  There was no evidence their attention was distracted or impaired at the time of the crime.  The officer also testified that both Blow and Murphy identified Moore immediately as one of the perpetrators and evinced certainty in their choice.  Finally, he conducted the lineup only one day after the crime.  This evidence does not, overall, support a determination that the lineup identifications were unreliable under the totality of the circumstances.  While Murphy and Blow may have initially failed to describe accurately such things as Moore's height, weight, and darkness of skin, other evidence, relating to their opportunity to view him at the time of the crime, their degree of attention, the level of their certainty at the confrontation, and the time between the crime and the confrontation, all tended to support a determination of reliability.

14 (Slip Op. at 5-6.)  On balance, although there were inaccuracies in petitioner's initial

15 description of the suspect, the other four factors strongly indicate the identification of

16 petitioner was reliable.  In particular, Murphy had more than ample opportunity to view

17 petitioner at the time of the incident, there was no indication that Murphy's attention was

18 poor or impaired, Murphy was immediately certain about the identification, and only one day

19 passed between the incident and the photographic identification.  See, e.g., United States v.

20 Wang, 49 F.3d 502, 505 (9th Cir. 1995) (finding identification of defendant in photographs

21 reliable where witness had ample opportunity to view defendant and actually spoke with

---

[3] At the hospital, Murphy described the suspect as 6' tall, weighing 180 pounds, dark-complected, and without facial hair, and did not mention jewelry, tattoos, or a gap in the suspect's front teeth. (Resp.'s Ex. 2, Reporter's Transcript ("RT") at 49, 261-62.) Petitioner is 5'9" - 5'10" tall; at the time in question, he weighed 220 pounds, and had a mustache, pierced ears and tongue, tattoos, and a gap in his front teeth. (RT at 33, 152, 167, 224, 261-62.)

[4] Murphy testified he had seen petitioner a "few times" at a local Carl's Jr. (RT at 106), had seen him in the neighborhood at least five times (RT at 231), and had been to petitioner's house and spoken to petitioner on that occasion (RT at 233). The record does not reflect whether Murphy knew petitioner's name, however, and Murphy did tell the officer that the man whom he later identified as petitioner had "looked familiar." (RT at 234.)

8

him).  Consequently, the Court of Appeal reasonably concluded Murphy's identification of petitioner was reliable.

In sum, the photographic lineup was not impermissibly suggestive and Murphy's identification of petitioner was sufficiently reliable.  Consequently, the admission of Murphy's identification evidence did not violate petitioner's right to due process, and the state court's denial of this claim was neither contrary to nor an unreasonable application of federal law.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2.      Admission of Petitioner's Statement to Police Regarding His Residence

Petitioner claims his statement to the police regarding his residence was taken in violation of Miranda v. Arizona, and thus the admission of such statement violated his right against self-incrimination.  The California Court of Appeal set forth the background for this claim, as follows:

> After conducting the photographic lineup, the police issued a bulletin describing Moore as a robbery suspect.  At 3:00 a.m. on May 8, 2002, an officer stopped a vehicle for a traffic violation some six blocks from the scene of the crime.  The officer recognized the driver, Moore, from the bulletin, and arrested him.  The investigating officer interviewed Moore at the police station soon afterwards.  It appears that, at 5:17 a.m., Moore told the investigating officer "he was staying at the Broadway Motel, Room Number 207 by himself."  At 5:30 a.m., the investigating officer gave Moore a *Miranda* warning.  Later the same day, the arresting officer checked this address and learned the motel had no such room number.  Moore made a motion in limine to exclude any reference to his statement about his address.  The court ruled it was admissible as a response to a routine booking question. During trial, when the arresting officer testified concerning this statement and the results of his efforts to verify the address, the court overruled Moore's renewed objection. Meanwhile, Moore's two alibi witnesses testified that Moore often stayed at the address where the assault and robbery occurred, although they gave conflicting accounts about whether he was staying there at the time of assault and robbery. The prosecution argued that Moore had lied about his address because, being one of the perpetrators, he knew where the crime had been committed and sought to disassociate himself from that address.  Moore's counsel objected to his argument but did not request any curative instruction.

(Slip op. at 7.)

In Miranda v. Arizona, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. See Miranda v. Arizona, 384 U.S. at 444.  "[I]nterrogation means questioning or 'its

9

functional equivalent,' including 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Pope v. Zenon, 69 F.3d 1018, 1023 (9th Cir. 1995) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). There is an exception to the general rule regarding interrogation, such that "words or actions on the part of the police" that are "normally attendant to arrest and custody" do not need to be preceded by Miranda warnings. Innis, 446 U.S. at 301; see United States v. Younger, 398 F.3d 1179, 1186 (9th Cir. 2005). The Supreme Court has further recognized "a routine booking exception which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (internal quotations and citations omitted). The police may not, however, "ask questions, even during booking, that are designed to elicit incriminatory admissions." Id. at 602 n.14. In Muniz, the Supreme Court found the officer's questions as to the suspect's name, address, height, weight, eye color, date of birth and current age fell within the "routine booking exception" to Miranda. Id. at 601-02.

In the instant case, the California Court of Appeal's denial of petitioner's claim was not "contrary to" federal law under § 2254(d)(1); the Court of Appeal cited the appropriate standards from Miranda, Innis and Muniz (see Slip Op. at 7), and petitioner points to no Supreme Court decision, and this Court is aware of none, in which a Miranda violation was found on a set of facts materially indistinguishable from the instant case.

Further, the denial of petitioner's claim was a "reasonable" application of federal law under § 2254(d)(1). Petitioner argues that when the officer asked for petitioner's address, the question was designed to elicit an incriminating response, not simply routine biographical information for booking purposes. The Court of Appeal found to the contrary, as follows:

> Moore was entitled to, but did not, request an evidentiary hearing on the issue of his pre-*Miranda* statement. (See Evid. Code, § 402, subd. (b).) Thus, for example, he never examined the investigating officer concerning the particular circumstances surrounding his question concerning Moore's address. The only facts considered by the trial court may be regarded as undisputed. These were cited by Moore's counsel from an investigation report, which was not itself admitted into evidence at the time Moore's counsel argued the merits

10

> of the motion in limine to exclude Moore's statement. As noted above, these facts indicated only that Moore made the statement to the investigating officer at the station, two hours and 17 minutes after his arrest and 13 minutes before he received a *Miranda* warning.
> 
> Moore argues the investigating officer should have known the question was reasonably likely to elicit an incriminating response because that officer had already learned that Moore was "associated" with the address where the attack occurred. We note, however, that Moore did not mention this or any other fact except those mentioned above, either in arguing the motion in limine or in his later objections relating to the admission of his statement. The investigating officer did not testify about Moore's association with this address until several days after the motion in limine to exclude Moore's statement. During a subsequent evidentiary hearing concerning Moore's motion to suppress the photographic lineup identifications, the investigating officer explained that he had selected Moore as the primary suspect in part because of the results of a computer search that "associated" Moore's name with the address where the assault and robbery occurred. Even then, the officer could not say how Moore was "associated" with the address – the results of his computer search essentially showed only that Moore's name and the address appeared together on at least one police report filed within the preceding five years.
> 
> The Ninth Circuit Court of Appeals has held that a question concerning a suspect's address was subject to the *Miranda* warning rule when the circumstances showed it was not a routine booking question. The question in that case was posed by an agent near the scene of the crime being investigated. The suspect was under arrest but had not yet been transported to any station for booking. The agent asked the question not in the context of other questions designed to elicit biographical data, but in the context of other questions that were clearly investigatory in nature. Further, the question was very closely related to an element of the crime the agent was investigating. The agent's object was to find and arrest the occupant of an apartment for possession of illegal drugs found within it. (*See United States v. Disla* (9th Cir. 1986) 805 F.2d 1340, 1347.)
> 
> By contrast, Moore here made the statement about his address at the police station. He made it a little over two hours after his arrest. Although it was elicited by the investigating officer, there is nothing to indicate Moore had previously been questioned by a booking officer. Nor is there any indication of the content of context of the officer's question that might show it was intended or perceived to be investigatory in nature. The fact the officer knew Moore was somehow associated with the address where the attack and robbery occurred is not sufficient, without more, to establish that his question was investigatory under these circumstances. In sum, Moore's statement was made in response to a question typically regarded as one within the routine booking exception to *Miranda*, and the circumstances surrounding the question do not establish that it was "designed to elicit incriminatory admissions" (*Pennsylvania v. Muniz, supra,* 496 U.S. at p[ ]. 602, fn. 14) rather than "to secure [']the biographical data necessary to complete booking[']" (*id.* at p. 601). We conclude there was no error admitting Moore's statement.

(Slip Op. at 8-10.)

The Court of Appeal reasonably concluded that the officer's question was not part of an interrogation, but rather a routine booking question. To begin with, as noted by the Court

11

1 of Appeal, an arrestee's address is the kind of basic biographical information generally
2 needed for booking.  See, e.g, Muniz, 496 U.S. at 601.  The Court of Appeal also reasonably
3 distinguished this case from Disla, in that the question was not posed to petitioner at the
4 scene of the crime, but rather after petitioner had been transported to the police station.  See
5 Disla, 805 F.3d at 1257.  Moreover, petitioner does not allege, and there is no indication in
6 the record, the police asked the question in the context of investigatory questioning, as
7 opposed to in the context of routine questions seeking basic biographical information.  Cf. id.
8 Finally, nothing in the record suggests the booking process already had been completed, or
9 that the officer already knew petitioner's address, when the question was posed to petitioner.
10 As explained by the Court of Appeal, the only association of which the officer was aware
11 between petitioner and the address at which the crime occurred was that, on one occasion in
12 the past five years, petitioner's name appeared in the same police report as that address.
13 Such limited information does not show petitioner lived there at the time of the report, much
14 less that he was living there at the time of the instant incident.  In the absence of any facts in
15 the record[5] indicating the question about petitioner's address was anything more than a
16 routine booking question, the Court of Appeal's finding that petitioner's response was
17 admissible at trial was not an "unreasonable" application of federal law under § 2254(d)(1).
18      Accordingly, petitioner is not entitled to habeas relief on this claim.
19      3.   Flight Instruction
20 Petitioner claims the denial of his counsel's request to omit a flight instruction
21 violated his right to assistance of counsel.  Evidence was introduced at trial that following the
22 robbery and assault, the two suspects ran away.  The prosecution requested the jury be given
23 an instruction, pursuant to CALJIC No. 2.52, that it could consider evidence of flight as

---

[5] Petitioner does not allege any facts outside the record concerning the circumstances of the police questioning, nor does he seek an evidentiary hearing on this issue.  In any event, as petitioner did not pursue his opportunity for an evidentiary hearing on this issue in state court (see Slip Op. at 8 (citing Cal. Evid. Code § 402(b)), an evidentiary hearing is not available to petitioner in this court.  See  28 U.S.C. § 2254(e)(2) (providing federal court may not hold evidentiary hearing on claim for which petitioner failed to develop factual basis in state court except in limited circumstances).

evidence of guilt, but that such evidence was not in and of itself sufficient to establish guilt. Petitioner objected to the instruction on the ground it was inconsistent with his identity defense. The trial court overruled the objection on the ground the instruction was warranted in light of the evidence presented at trial. As explained by the Court of Appeal:

> The [trial] court did, however, offer to modify the instruction to emphasize to the jury its applicability only if the jury determined there was sufficient proof identifying Moore as one of the men who attacked Murphy. Moore's trial counsel reiterated his objection for the record, but expressed preference for the modified version if the court was determined to give a flight instruction in some form. The modified instruction stated: '*If you find that the defendant was a person who ran from the scene of the crime or crimes alleged in the information, you may consider that* the flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether the defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide.' (Cf. CALJIC No. 2.52 (italics indicate additional language modifying the standard instruction).)

(Slip Op. at 10 n.4.)

Petitioner argues the above instruction "deprived" him of "the assistance of counsel during a critical stage of the proceeding" because it "interfered with defense counsel's strategy to waive the flight instruction" in pursuit of an identity defense. (See Petition at 6.) Petitioner cites no Supreme Court authority, however, and this Court is aware of none, providing that a trial court violates a defendant's Sixth Amendment right to counsel simply because a jury instruction does not advance his theory of defense. As discussed above, federal habeas relief is only available on the basis of a state court ruling that is contrary to or an unreasonable application of "clearly established federal law, as determined by the Supreme Court of the United States." See 28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 412. Petitioner argues he had a right to "waive," (see Petition at 6), the instruction and thereby preclude the jury from being instructed on evidence of flight. In the absence of any Supreme Court authority recognizing such right, however, or that a jury instruction violates a defendant's right to counsel if it is inconsistent with a theory defense counsel is pursuing, petitioner is not entitled to habeas relief on this claim.

Moreover, although petitioner does not allege a due process violation with respect to

13

this claim, the Court notes that the flight instruction, as modified by the trial court, did not prevent petitioner from presenting his identity defense. The instruction was modified to state explicitly that it only applied "if" the jury found petitioner "was a person who ran from the scene of the crime." (Slip Op. at 10 n.4.) In other words, the flight evidence would only be considered if the jury did not believe petitioner's identity defense. Consequently, the instruction in no way deprived petitioner of the opportunity to argue to the jury, as he did, that he was not one of the men who committed the crime and ran away from the scene. The record thus indicates the flight instruction did not "interfere" with petitioner's presentation of his identity defense at trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: June 27, 2007

_____
MAXINE M. CHESNEY
United States District Judge